## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## Judge Robert E. Blackburn

Criminal Case No. 10-cr-00509-REB-01

UNITED STATES OF AMERICA,

    Plaintiff,

v.

2. RAMONA CAMELIA FRICOSU,
    a/k/a Ramona Smith,

    Defendant.

## ORDER DENYING MS. FRICOSU'S MOTION REGARDING DNA SAMPLE

**Blackburn, J.**

    The matter before me is **Ms. Fricosu's Motion Regarding DNA Sample** [#93][1] filed March 30, 2011. I deny the relief requested.

    On October 6, 2011, prior to her initial appearance in this case, defendant, Ramona Fricosu, presented herself to the United States Marshal in Denver for processing. Pursuant to standard practice, agents took, *inter alia*, a DNA sample from Ms. Fricosu at that time. The sample was obtained under the aegis of the DNA Act, 42 U.S.C. § 14135a, which allows the Attorney General, or any delegated representative "that arrests or detains individuals or supervises individuals facing charges," to collect DNA samples "from individuals who are arrested, facing charges, or convicted." 42 U.S.C. § 14135a(a)(1)(A). These samples are furnished to the Director of the FBI for analysis and inclusion in the

---

[1] "[#93]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

Combined DNA Index System ("CODIS"). *Id*. § 14135a(b).[2]  Ms. Fricosu now requests an order requiring that the sample and any DNA profiles developed from it be destroyed on the ground that the taking of the sample violates her Fourth Amendment rights.

To date, only two federal appellate courts have considered the constitutional issues implicated by the DNA Act insofar as it applies to the collection of DNA samples from arrestees and pretrial detainees.[3]  A panel of the Ninth Circuit was the first to consider the issue in **United States v. Pool**, 621 F.3d 1213 (9th Cir. 2010), but that decision was automatically vacated by the granting of a petition for rehearing *en banc*, as a consequence of which "[t]he three-judge opinion may no longer be cited as binding precedent by or to any court of the Ninth Circuit." **United States v. Pool**, 646 F.3d 659, 659 (9th Cir. 2011) (citation and internal quotation marks omitted).[4]  Thus, I look to the remaining decision, **United States v. Mitchell**, 652 F.3d 387 (3rd Cir. 2011) (en banc), **pet. for cert. filed** (Nov. 22, 2011) (No. 11-7603, 11A384), for initial guidance.

In analyzing the Fourth Amendment issues presented by section 14135a(a)(1)(A),

---

[2] This section codifies the DNA Act of 2000, Pub.L. No. 106–546, § 3(a)(1) & (2), 114 Stat. 2726, 2728, which is part of the Violent Crime Control and Law Enforcement Act of 1994 (the "Crime Control Act"), Pub.L. No. 103–322, 108 Stat. 1796 (codified as amended at 42 U.S.C. §§ 13701–14223). The Crime Control Act authorized the FBI to create CODIS. CODIS "allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system." **H.R. Rep.** 106–900(I), at 8 (2000), *reprinted in* 2000 U.S.C.C.A.N. 2323, 2324. The Violence Against Women & Department of Justice Reorganization Act of 2005, Pub.L. No. 109–162, § 1004, 119 Stat. 2960, 3085, expanded the categories of individuals subject to the DNA Act to include arrestees, and the implementing regulation, 28 C.F.R. § 28.12, became effective January 9, 2009. **United States v. Mitchell**, 652 F.3d 387, 401 (3rd Cir. 2011), **pet. for cert. filed** (Nov. 22, 2011) (No. 11-7603, 11A384.

[3] By contrast, numerous courts, including the Tenth Circuit, **see Banks v. United States**, 490 F.2d 1178, 1193 (10th Cir. 2007), have upheld the constitutionality of the DNA Act as applied to prisoners or those on probation, parole, or supervised release following conviction of a crime. **See Mitchell**, 652 F.3d at 402 & n.13 (citing cases).

[4] Even more recently, the panel opinion was vacated entirely when the defendant entered a guilty plea. **United States v. Pool**, 659 F.3d 761, 761-62 (9th Cir. 2011).

the majority in ***Mitchell*** applied a totality of the circumstances approach, noting that such "is the general Fourth Amendment approach used to assess the reasonableness of a contested search," and that a majority of the courts analyzing different applications of the DNA Act have used this framework, including the Tenth Circuit. ***See id.*** at 402-43 & n.15 (citation and internal quotation marks omitted).[5]  Under this approach, the court must weigh the nature of the intrusion and the defendant's relative privacy interest against the extent to which the collection of DNA samples and creation of DNA profiles advance legitimate government interests.  ***See id***. at 403-04.  Other factors that bear on the reasonableness of the search may be considered also.  ***Id***. at 404.

      Considering first the degree to which the collection of a DNA sample intrudes on the affected individual's privacy, the Third Circuit noted that, in fact, two separate searches must be considered – the collection of the sample and the subsequent processing and creation of a CODIS profile.  ***Id.*** at 406-07.  The court had little trouble in concluding that a DNA swab is at least no more invasive than the taking of a blood sample or the administration of a breathalyzer test, both of which are clearly constitutional.  ***See id.*** (citing, *inter alia*, ***Skinner v. Railway Labor Executives' Association***, 489 U.S. 602, 625, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989)).  ***See also Hamilton v. Brown***, 630 F.3d 889, 894 (9th Cir. 2011) (citing cases).  To the extent Ms. Fricosu seeks to challenge this aspect of the retrieval of a DNA sample in her case, I agree that the invasion of privacy is minimal.  ***Mitchell***, 652 F.3d at 407.

---

     [5]  The ***Mitchell*** court noted that although the Tenth Circuit in ***Banks*** found its own precedents divided, it applied the totality of the circumstances test in analyzing Fourth Amendment issues implicated by the DNA Act.  ***Mitchell***, 652 F.3d at 403 n.15.

The invasion of privacy attendant on the creation of the CODIS profile presents a more difficult question. Indisputably, there is a "vast amount of sensitive information that can be mined from a person's DNA and [thus a] very strong privacy interest[] . . . in this information." *Id.* (quoting ***United States v. Amerson***, 483 F.3d 73, 85 (2nd Cir.), ***cert. denied***, 128 S.Ct. 646 (2007)). The defendant in ***Mitchell*** posited a variety of potentially nefarious uses to which this information might be put, and Ms. Fricosu follows in this vein, suggesting that allowing the government to collect and hold this information is akin to releasing the proverbial genie from his bottle.

Although I am not insensitive to this line of reasoning, Ms. Fricosu has failed to establish that such hypothetical abuses are either likely or imminent.[6] The law specifies the four, limited purposes for which the DNA profile may be used, *see* 42 U.S.C. § 14135a(b)(3), and the Department of Justice's implementing regulations acknowledge the limited purposes for which such profiles may be retained in CODIS, 73 Fed. Reg. 74937-38.[7] The statute imposes criminal and financial penalties for improper use of DNA samples, 42 U.S.C. § 14135e(c), and limits access to DNA materials, *id.* §

---

[6] Ms. Fricosu neither argues nor proves that any information or profile developed from the DNA swab taken from her has been used for any purpose not authorized by the DNA Act or has been otherwise misused.

[7] The regulation provides that

> the DNA profiles retained in the system are sanitized "genetic fingerprints" that can be used to identify an individual uniquely, but do not disclose an individual's traits, disorders, or dispositions. The rules governing the operation of CODIS reflect its function as a tool for law enforcement identification, and do not allow DNA information within the scope of the system to be used to derive information concerning sensitive genetic matters.

73 Fed. Reg. at 74937–38.

14133(b)(1)(A)-(C). It also contains provisions allowing for the expungement of DNA information if the defendant is acquitted or the charges are dismissed. *Id.* § 14132(d)(1)(A). *See also Mitchell*, 652 F.3d at 407-08.

Concerns about potential misuse of DNA profiles created pursuant to the statute are buffered further by the requirement that the profile be created only from "junk DNA."[8] *Mitchell*, 652 F.3d at 408. At present, junk DNA does not to reveal genetic traits, such as physical and medical characteristics. *See United States v. Kriesel*, 508 F.3d 941, 947 (9th Cir. 2007). Although other courts have noted the existence of scientific evidence suggesting that junk DNA may contain genetic information that could be extracted as technology advances, *see Pool*, 621 F.3d at 1221, Ms. Fricosu has offered no actual evidence bearing on the matter. Moreover, any alteration of the core loci used to create CODIS DNA profiles must be proceeded by prior notice to Congress. *See* P.L. No. 108-405 § 203(f), 118 Stat. 2260 (Oct. 30, 2004) ("If the Department of Justice

---

[8] "Junk DNA" has been described thus:

> Through the use of short tandem repeat technology ("STR"), the [FBI] analyzes the presence of various alleles located at 13 markers (or loci) on DNA present in the specimen. These STR loci are each found on so-called "junk DNA" – that is, non-genic stretches of DNA not presently recognized as being responsible for trait coding – and were purposely selected because they are not associated with any known physical or medical characteristics. Because there are observed group variances in the representation of various alleles at the STR loci, however, DNA profiles derived by STR may yield probabilistic evidence of the contributor's race or sex. Even so, DNA profiles generated by STR are highly individuated: Due to the substantial number of alleles present at each of the 13 STR loci (between 7 and 20) and wide-spread variances in their representation among human beings, the chance that two randomly selected individuals will share the same profile are infinitesimal – as are the chances that a person randomly selected from the population at large will present the same DNA profile as that drawn from crime-scene evidence.

*United States v. Kincade*, 379 F.3d 813, 818-19 (9th Cir. 2004) (en banc), **cert. denied**, 125 S.Ct. 1638 (2005) (footnotes, citations, and internal quotation marks omitted).

plans to modify or supplement the core genetic markers needed for compatibility with the CODIS system, it shall notify the Judiciary Committee of the Senate and the Judiciary Committee of the House of Representatives in writing not later than 180 days before any change is made and explain the reasons for such change."). Moreover, as the Ninth Circuit noted in resolving another part of the same statute,

> our job is limited to resolving the constitutionality of the program before us, as it is designed and as it has been implemented. In our system of government, courts base decisions not on dramatic Hollywood fantasies, but on concretely particularized facts developed in the cauldron of the adversary process and reduced to an assessable record. If . . . and when, some future program permits the parade of horribles the DNA Act's opponents fear . . . we have every confidence that courts will respond appropriately.

*Kincade*, 379 F.3d at 837–38 (footnotes and internal citations omitted).

Finally, as the *Mitchell* court noted, there is a distinction between the DNA sample, which include significant amounts of private information, and the DNA profile entered in CODIS, which at present reveals only identity. *Mitchell*, 652 F.3d at 413.

> [W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes.

*Id.* at 411 (quoting *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir.), *cert. denied*, 113 S.Ct. 472 (1992)).[9] *See also United States v. Olivares–Rangel*, 458 F.3d 1104, 1113 (10th Cir. 2006) ("Fingerprinting ensures that the person who has been arrested is in fact

---

[9] The Third Circuit also noted that the defendant in *Mitchell* was arrested after indictment, "so that the finding of probable cause in this case was made by a grand jury and was not left to the discretion of a police officer alone." *Mitchell* 652 F.3d at 412 n.22.

the person law enforcement agents believe they have in custody. . . . The government always has the right, and indeed the obligation, to know who it is that they hold in custody regardless of whether the arrest is later determined to be illegal."). A long line of well-established authority provides that arrestees and pretrial detainees have a diminished expectation of privacy in their identities, and, thus, are subject to routine booking practices that confirm identity, regardless of whether identity is at issue in the case. *See id.* at 411-14 & n.23.

Considering the other side of the totality of the circumstances equation – the degree to which the search promotes legitimate governmental interests – several such interests are served by section 14135a(a). Foremost, as noted above, the government has a legitimate interest in collecting identifying information to aid law enforcement in accurately identifying arrestees and pretrial detainees. *See id.* at 413-14. This interest is served directly by collecting and cataloging DNA evidence; indeed, DNA evidence serves that interest with much more precision than other current methods of identification. *See id*. The government has a legitimate interest also in determining whether an arrestee is implicated in other crimes, to determine whether bail is appropriate. *Id.* at 141. Conversely, comparison of a DNA sample to the CODIS database can establish that the arrestee or pretrial detainee is not implicated in the crime for which she has been arrested and/or indicted. *See id.* at 414-15. "[U]se of CODIS promptly clears thousands of potential suspects – thereby . . . advancing the overwhelming public interest in prosecuting crimes accurately." *Id.* at 415 (quoting *Kincade*, 379 F.3d at 839 n.38) (footnote and internal quotation marks omitted). All these considerations present puissant, legitimate government interests.

Finally, as the *Mitchell* majority noted, the confluence between the DNA Act and the implementing regulations leaves no room for discretion (or abuse thereof) on the part of law enforcement in deciding whether to collect a DNA sample. *Id.* DNA samples must be collected whenever the Attorney General has determined that they must be. This additional factor, in combination with the safeguards built into the statute recounted above, led the *Mitchell* majority to conclude that 42 U.S.C. § 14135a(a) was constitutional as applied to arrestees and pretrial detainees.[10] I find this reasoning persuasive, and, thus, deny Ms. Fricosu's request for relief.

**THEREFORE, IT IS ORDERED** that the relief requested in **Ms. Fricosu's Motion Regarding DNA Sample** [#93] filed March 30, 2011, is **DENIED**.

Dated February 22, 2012, at Denver, Colorado.

**BY THE COURT:**

Bob Blackburn
Robert E. Blackburn
United States District Judge

---

[10] This determination also precluded the defendant's facial challenge, as he per force could not show that there were no set of circumstances under which the statute could be constitutionally applied. *See Mitchell*, 652 F.3d at 415.