IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 10-cr-00509-01-REB

UNITED STATES OF AMERICA,

> Plaintiff,

v.

2.   RAMONA CAMELIA FRICOSU,
     aka Ramona Smith,

> Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS
## RELEVANT TO SENTENCING

---

The United States of America (the government), by and through Patricia Davies

and Anna Edgar, Assistant United States Attorneys for the District of Colorado, and the

defendant, Ramona Camelia Fricosu aka Ramona Smith (hereafter, Fricosu), personally

and by counsel, Philip Dubois, Esq., submit the following Plea Agreement pursuant to

Fed. R. Crim. P. 11(a)(2), 11(c)(1)(A), 11(c)(1)(B) and D.C.COLO.LCrR 11.1.

### I.  AGREEMENT

(A) Pursuant to Fed. R. Crim. P. 11(a)(2) and with the government's consent, the

defendant agrees to enter conditional pleas of guilty to Counts 3, 16, and 35 of the

Indictment, charging violations of Title 18, United States Code, Sections 1344 & 2 (Bank

Fraud & Aiding/Abetting); Sections 1343 & 2 (Wire Fraud & Aiding/Abetting) and

Sections 1014 & 2 (False Statements to Financial Institutions & Aiding/Abetting),

1

Court's Exhibit

1

respectively. Ms. Fricosu's conditional pleas to Counts 3, 16, and 35 of the Indictment preserve her right to appeal the District Court's Order Granting the Government's Application Under the All Writs Act (Doc. 247, entered 1/23/2012). The parties understand that the Court must also consent to the conditional nature of Ms. Fricosu's pleas. Defendant also agrees to admit the forfeiture allegations set forth in Paragraphs 30-35 of the Indictment, as they pertain to the Counts to which defendant agrees to plead guilty, namely Counts 3, 16, and 35.

(B) The government agrees that it will dismiss the remaining counts of the Indictment against her, namely, Counts 1 – 2, 4 –15, 27 – 33, and 36 – 49 at the time of Ms. Fricosu's sentencing on Counts 3, 16 and 35.

(C) The government agrees to move for a three-level downward adjustment for acceptance of responsibility assuming that defendant's offense level is greater than 16, and contingent upon defendant's continued acceptance of responsibility through the time of sentencing, pursuant to U.S.S.G. § 3E1.1(a).

(D)    The parties agree that the total adjusted offense for Mr. Fricosu, assuming the three-level reduction for acceptance of responsibility, is not greater than 18 based on the calculations pursuant to the advisory United States Sentencing Guideline range in section IV, below.[1]

---

[1]In Section IV, the parties have set forth the stipulated sentencing calculation under the advisory USSG that yields a total adjusted offense level of 18, after the defendant receives credit for acceptance of responsibility. However, Ms. Fricosu may argue that she is entitled to a further reduction under USSG § 3B1.2(b) for "minor role." The government disputes that this downward adjustment applies.

(E)   The government agrees to recommend that if Ms. Fricosu's sentence includes imprisonment, her period of imprisonment should be "staggered" with any period of imprisonment imposed on co-defendant Scott Whatcott aka Michael Smith; that is, the government will recommend that the defendants' respective periods of incarceration shall occur consecutively to rather than simultaneously with each other so that one of the defendants (Ms. Fricosu or Mr. Whatcott) is available to care for the defendants' minor children.  The government agrees not to recommend remand of Ms. Fricosu between entry of her guilty pleas and sentencing, so long as the government does not learn any new information suggesting that Ms. Fricosu poses a danger to the community or a flight risk, and she continues to accept responsibility for her crimes.

(F)  Defendant agrees to pay the special assessment due at the time of sentencing if she is financially able to do so.

(G)  The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following four criteria: (1) it is an appeal of the District Court's Order Granting Government's Application under the All Writs Act (Doc. 247, entered 1/23/2012); (2) the sentence imposed is above the maximum penalty provided in the statute of conviction; (3) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upwardly;

or (4) the Court determines that the offense level is greater than 18 and imposes a

sentence based upon that offense level determination.  Except as provided above, the

defendant also knowingly and voluntarily waives the right to appeal the manner in which

the sentence is determined on grounds set forth in 18 U.S.C. § 3742 or any ground

whatever. The defendant also knowingly and voluntarily waives her right to challenge

this prosecution, conviction, or sentence and/or the manner in which it was determined

in any collateral attack, including but not limited to a motion brought under 28 U.S.C. §

2255.  This waiver provision, however, will not prevent the defendant from seeking relief

otherwise available if: (1) there is an explicitly retroactive change in the applicable

guidelines or sentencing statute; (2) there is a claim that the defendant was denied the

effective assistance of counsel; or (3) there is a claim of prosecutorial misconduct.

Additionally, if the government appeals the sentence imposed by the Court, the

defendant is released from this waiver provision.

(H)     The defendant agrees to forfeit to the United States immediately and

voluntarily her interest in any and all assets and property, or portions thereof, subject to

forfeiture, pursuant to18 U.S.C. §§ 982(a)(2), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C.

§ 2461(c), whether in the possession or control of the United States, or in the

possession or control of the defendant or defendant's nominees, or elsewhere. The

assets to be forfeited specifically include, but are not limited to: a money judgment in the

amount of $912,038.65, which amount represents the proceeds obtained as a result of

the defendant's criminal offenses; $10,233.00 in United States Currency seized on May

4

14, 2010; and the 2008 Dodge Dakota truck, which was obtained through proceeds of the defendant's criminal offenses.  Defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. Further, the defendant admits and agrees that the conduct described in the Stipulation of Facts below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. The government has been advised that Ms. Fricosu has one additional vehicle, has not traced proceeds of the fraud to that vehicle, and agrees not to seek its forfeiture. Further, the government does not believe that Ms. Fricosu has any interest that provides a basis for the government to seek forfeiture as to her current residence (10436 Ross Lake Drive, Peyton, CO), and thus, will not do so.

(I)  The government states that, if the Bureau of Prisons, acting in its normal course and sole discretion, determines that Ms. Fricosu suffers from substance addiction and would benefit from drug treatment while she is incarcerated, the government then recommends that she receive such drug abuse treatment.

(J)  This plea agreement confirms the entire agreement between the defendant and the Government with respect to the defendant's guilty plea, and no other promises, representations, or inducements have been made to defendant or defendant's attorney.

## II.  ELEMENTS OF THE OFFENSES

The parties agree that the elements of the offenses to which this plea is being tendered are as follows:

5

The parties agree that there is no dispute as to the material elements which establish a factual basis for the offenses of conviction. Defendant understands that in order to prove her guilt on Count 3 (bank fraud & aiding/abetting), the government must prove, beyond a reasonable doubt, that:

(1)  the defendant knowingly executed or attempted to execute a scheme or artifice to defraud and to obtain money or property from Wells Fargo Home Mortgage by means of false or fraudulent pretenses, representations, or promises;

(2)  Wells Fargo Home Mortgage was a financial institution within the meaning of the law in that it was insured by the Federal Deposit Insurance Corporation;

(3) the defendant acted with intent to defraud; and

(4) the false or fraudulent pretenses, representations, or promises that the defendant made were material.

A "scheme or artifice to defraud" includes any design, plan, pattern or course of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived. A defendant acts with the requisite "intent to defraud" if the defendant acted knowingly and with the specific intent or purpose to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to the defendant.

Defendant understands that in order to prove her guilt on Count 16 (wire fraud & aiding/abetting), the government must prove, beyond a reasonable doubt, that:

6

(1) The defendant devised or intended to devise a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses, representations or promises; that is, defendant Ramona Fricosu, acting with co-defendant Scott Whatcott: (a) located distressed home sellers in the Colorado Springs area; (b) convinced the distressed home sellers to transfer title to their residential property to defendants to facilitate defendant's supposed assumption of the residential mortgage or refinancing of such mortgage; (c) would then initiate a fraudulent quiet title action, falsely claiming on fraudulent proof of service documents filed in state court that the mortgage lender, homeowner, and other interested parties had been served; and (d) once title was "quieted" in Fricosu's or Whatcott's name, sell the residence to a third party, collect the proceeds and fail to pay the existing mortgage.

(2) The defendant acted with specific intent to defraud and to obtain money or property by means of false or fraudulent pretenses, representations or promises;

(3) The defendant used or caused another person to use interstate wire communications facilities for the purpose of carrying out the scheme.

(4) The scheme employed false or fraudulent pretenses, representations, or promises that were material.

A "scheme to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension. An "intent to defraud or obtain money by false or fraudulent pretenses, representations, or

promises" means an intent to deceive or cheat someone. A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud. A false statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed. To "cause" interstate wire communications facilities to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course of business or where such use can reasonably be foreseen.

Defendant understands that in order to prove her guilt on Count 35 (false statement to financial institution & aiding/abetting), the government must prove, beyond a reasonable doubt, that:

(1) Washington Mutual was federally insured;

(2) The defendant made a false statement to Washington Mutual;

(3) The defendant knew the statement was false when she made it; and

(4) In doing so, the defendant intended to influence Washington Mutual to approve a loan application for the purchase of a residence located at 9070 Christy Court, Colorado Springs, Colorado.

To meet its burden of proof, it is not necessary for the government to prove that the institution involved was in fact influenced or misled. A statement may be spoken, written, or made by other conduct that communicates a fact to another person.

As to defendant's liability under 18 U.S.C. § 2 (aiding/abetting), for each of the aforementioned offenses, the government would need to prove, beyond a reasonable doubt, that:

First: someone else committed the charged crime, and

Second: the defendant intentionally associated herself in some way with the crime and intentionally participated in it as she would in something she wished to bring about. This means that the government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.  (Tenth Cir. Pattern Jury Instructions for 18 U.S.C. §§ 1344, 1343, 1014 & 2; definitions).

### III.  STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. §§ 1344 & 2 (Count 3) is: not more than 30 years' imprisonment, not more than $1,000,000 fine, or both; not more than 5 years' supervised release; and $100 special assessment fee.

The maximum statutory penalty for a violation of 18 U.S.C. §§ 1343 & 2 (Count

16) is: not more than 20 years' imprisonment, not more than $250,000 fine, or both; not more than 3 years' supervised release; and $100 special assessment fee.

The maximum statutory penalty for a violation of 18 U.S.C. §§ 1014 & 2 (Count 35) is: not more than 30 years' imprisonment, not more than $1,000,000 fine, or both; not more than 5 years' supervised release; and $100 special assessment fee.

Restitution in the amount of $1,728,071 shall be ordered in this case. 18 U.S.C. § 3663A(c)(3). The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury. A violation of the conditions of probation or supervised release may result in a separate prison sentence. Costs of supervision and/or incarceration may also be imposed.

## IV. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty pleas that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below that are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies those facts that are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have

stipulated and that are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the government's evidence would show that the date on which conduct relevant to the offenses (§1B1.3) began is in or about January 2006.

The parties agree that the government's evidence, including the: (1) the testimony of home sellers, realtors, escrow officers, bank employees, El Paso County Recorder's Office personnel, employees of Corporation Service Company, CT Corporation (registered agents), process servers, Yahoo! employees, Qwest employees, home buyers, federal investigators, and computer forensic analysts; and (2) documents, including recorded documents relating to real estate transactions, court documents for quiet title actions, bank records, logs of process served and received by registered agents for American Mortgage Network, Taylor, Bean & Whitaker, records from Yahoo!, records from Qwest, and regarding mail boxes controlled by defendants, would show the following:

Co-defendant Scott Anthony Whatcott conducted real estate transactions using the names Scott Whatcott, Michael Smith and Scott Vasadi (collectively, "Whatcott"). In 2007, Whatcott changed his name to Michael Smith through a legal proceeding, but continued using "Whatcott" and other names. Whatcott resided in and conducted his real estate transactions in the Colorado Springs, Colorado area.

Whatcott was previously married to defendant Ramona Camelia Fricosu, who also resided in the Colorado Springs area and participated in the real estate

11

transactions that form the basis for charges in the indictment. Ms. Fricosu changed her name to "Ramona Smith" through a court proceeding but also continued to use the name Fricosu.

### The Christy Court Transaction

In late 2005, Donald & Cheryl Maier owned a residence located at 9070 Christy Court, Colorado Springs, Colorado ("Christy Court Residence"). The Maiers sought to sell the Christy Court Residence because Mr. Maier's job situation required them to move to North Dakota.

Co-defendant Whatcott learned of the Christy Court Residence through his review of real estate listings, contacted the Maiers through a real estate agent, and attempted to purchase the property. Whatcott proposed that he assume the Maiers' mortgage as a means for Whatcott to purchase the Christy Court Residence from the Maiers. Fricosu, acting with co-defendant Whatcott, prepared and submitted to Washington Mutual, N.A.,[2] an application to assume the Maiers' mortgage for the Christy Court Residence. Along with the application, Fricosu submitted employment verification documents falsely claiming she worked at Woodcrafters (her step-father's furniture store) and bank account information falsely reflecting payroll deposits from Woodcrafters and inflating Fricosu's SSFCU savings account balances. Washington Mutual rejected the defendants' loan application.

---

[2]Washington Mutual was later acquired by Wells Fargo Bank (WFB), and WFB has sustained the loss on the Christy Court residence.

Whatcott convinced the Maiers to sign an "Irrevocable Limited Power of Attorney" ("POA"), which Whatcott told the Maiers was necessary for him to continue his efforts to assume their mortgage or to apply for a new loan to purchase the Christy Court Residence. The Maiers moved from the Christy Court Residence to North Dakota in or about October 2005. Whatcott told the Maiers that he would make all mortgage payments on their behalf while he sought to obtain a mortgage to complete the purchase of the Christy Court Residence. Fricosu and Whatcott each made mortgage payments for the Christy Court Residence to the correct mortgage lender, Washington Mutual/WFB between December 2005 and February 2009. Whatcott recorded the Maiers' signed POA in October 2006.

On July 13, 2007, Fricosu and Whatcott initiated a quiet title action in El Paso County District Court, case no. 07CV0236, with respect to the Christy Court Residence, and Fricosu signed the complaint. Named as defendants were each of the Maiers, Taylor, Bean & Whitaker, the company that previously held the Christy Court Residence mortgage but did not at the time of filing, and "all unknown persons who claim interest."

Also on July 13, 2007, Fricosu and Whatcott caused to be issued district court civil summons addressed to Donald Maier, Cheryl Maier, and Taylor, Bean & Whitaker, respectively. In late July 2007, completed returns of service in case no. 07CV0236, were filed stating that Donald Maier and Cheryl Maier had each been served on July 21, 2007, at the Christy Court Residence. However, on July 21, 2007, the Maiers resided in North Dakota, were not at the Christy Court Residence on that day, and were not

served with the civil summons in case no. 07CV0236.

In early August 2007, a completed return of service was filed in case no. 07CV0236 as to Taylor, Bean & Whitaker, reflecting that service was made to the registered agent at The Corporation Company on July 13, 2007. However, Fricosu knew that Taylor, Bean & Whitaker was not the mortgage lender for the Christy Court Residence on July 13, 2007, because, before that time, Fricosu and Whatcott each had made mortgage loan payments for the Christy Court Residence to Washington Mutual/WFB.

On August 14, 2007, Fricosu and Whatcott signed a motion for default judgment quieting title in the Christy Court Residence in the names of Scott Whatcott and Ramona Fricosu, and it was filed. On August 22, 2007, default judgment was entered in Fricosu's and Whatcott's favor in El Paso County District Court case no. 07CV0236. On or about September 5, 2007, the court entered a decree finding that Fricosu and Whatcott owned the Christy Court Residence in fee simple.

On September 10, 2007, Fricosu, along with Whatcott, signed a warranty deed transferring title of the Christy Court Residence to Michael Smith. The warranty deed was recorded in El Paso County on September 10, 2007.

In late February 2008, Whatcott, using the name Michael Smith, sold the Christy Court Residence to Heather McLean for $190,000. The proceeds of the sale were wire transferred into an account controlled by Whatcott at WFB, account # xxx xxx 6030. The mortgage loan on the Christy Court Residence with Wells Fargo was not paid when

Whatcott sold the property to McLean. The current unpaid principal balance of the

Maiers' Wells Fargo mortgage loan that was not paid at the time the Christy Court

Residence was sold (following Fricosu's transfer of title to Michael Smith) is

$170,637.78.

[Count 3] In particular, on or about September 10, 2007, in the state and district

of Colorado, Ramona Fricosu and Scott Whatcott signed a warranty deed transferring

title of the 9070 Christy Court, Colorado Springs, CO, residence to Michael Smith,

following the successful fraudulent quiet title action in case no. 07CV236, described

above. On September 10, 2007, the warranty deed for the Christy Court Residence in

Michael Smith's name was recorded in El Paso County, Colorado, for the purpose of

knowingly executing and attempting to execute the scheme or artifice to defraud or to

obtain money from Wells Fargo, which was federally insured and which Fricosu knew

was the actual mortgage lender for the Christy Court Residence.

### The Crooked Vine Court Transaction

On or about October 30, 2008, Whatcott, using the name Michael Smith,

obtained title to the property at 2757 Crooked Vine Court, Colorado Springs, Colorado

from Linda Hinton. This transaction was part of the scheme described above, namely,

locating distressed home sellers and promising to make mortgage payments until

defendants could obtain a new mortgage or assume the existing mortgage. A quit claim

deed was signed by Ms. Hinton to transfer title to Michael Smith, and the deed was

recorded on October 30, 2008. Smith agreed to make monthly mortgage payments on

Linda Hinton's mortgage loan until he could refinance the mortgage. On January 21, 2010, Ramona Fricosu of 6050 Stetson Hills Blvd., Colorado Springs, CO (which is a post office box that Ms. Fricosu controls) made an online mortgage payment on the Crooked Vine residence from Ent FCU in Colorado Springs to SunTrust Bank in Orlando, Florida.

After the quit claim deed in his name for the Crooked Vine residence was recorded, Michael Smith filed a complaint to quiet title on November 26, 2008, in case 08CV6361. The defendants were Ramona Smith and Colorado Capital Bank. Whatcott served a District Court civil summons on Ramona Smith on December 22, 2008. Fricosu, using the name Ramona Smith, filed a "Disclaimer" on February 17, 2009. Ramona Smith was not the owner of the property and did not have an ownership interest in the property.  Colorado Capital Bank was the original lender but not the lender at the time of the quiet title lawsuit.  Fricosu and Whatcott knew that the lender as of the time of the quiet title lawsuit was SunTrust Bank because they had each made online mortgage payments for the Christy Court residence to SunTrust Bank.

On February 17, 2009, Michael Smith filed a motion for decree quieting title. The final decree quieting title was recorded on February 23, 2009.

After Michael Smith obtained the decree quieting title to the Crooked Vine residence, on December 1, 2009, a warranty deed was recorded in El Paso County transferring title to the Crooked Vine residence from Michael Smith to Ramona Smith.

16

On January 19, 2010, Fricosu, using the name Ramona Smith, filed a complaint to quiet title for the property at 2757 Crooked Vine Court in El Paso County District Court case no. 10CV30.  The defendants were listed as M. Rodney Smith, Colorado Capital Bank, and "all unknown persons who claim any interest in the subject matter of this action."  Fricosu knew that M. Rodney Smith and Colorado Capital Bank did not have an interest in the property.

On March 17, 2010, Fricosu (as Ramona Smith), filed a motion for decree quieting title, and a decree quieting title was obtained on March 18, 2010.

On May 5, 2010, Ramona Smith sold the property at 2757 Crooked Vine Court for $110,000, which was significantly below the market value.  Fricosu signed an affidavit at closing that indicated that there were no outstanding security agreements or financing statements on the property.  She knew, however, that there was an outstanding mortgage with SunTrust Bank secured by the property.  Fricosu received the proceeds from the transaction via a wire transfer to Ramona Smith's Ent Federal Credit Union account.  She withdrew the proceeds from the sale of the property in cash on May 11, 2010.

The outstanding principal loan balance with SunTrust Bank was $368,090.98.

[Count 16] In particular, on or about January 10, 2010, in furtherance of the scheme to defraud and to obtain money or property by means of false or fraudulent pretenses, representations or promises as described above (namely, that defendants would make mortgage payments until they could refinance the mortgage but in reality,

17

would obtain sufficient time to complete fraudulent quiet title actions by making

mortgage payments), Fricosu made an online mortgage payment of $3,062.41 from Ent

FCU in Colorado Springs to SunTrust Bank in Orlando, FL.

**False Statements in Loan Application regarding the Christy Court Residence**

Fricosu and Whatcott furnished false information on a loan application to

Washington Mutual/WFB for the Christy Court residence. The false information included

fraudulent bank statements that inflated the amounts claimed in bank accounts, and

documents stating falsely that Fricosu and Whatcott each worked at Woodcrafters and

earned a monthly salary exceeding $2,400. Neither of these statements regarding

Fricosu and Whatcott's employent were true; neither had ever worked or earned money

as an employee of Woodcrafters.

On September 15, 2005, in a loan application regarding the Christy Court

residence, Fricosu listed her employer as Woodcrafters, and indicated that she had

been employed by Woodcrafters for 3 months and earned monthly income of $2,450.

Whatcott's employment in this loan application was also listed as Woodcrafters.

According to records of the Colorado Department of Revenue and information from

Woodcrafters, neither Fricosu nor Whatcott worked at Woodcrafters prior to September

2005 or thereafter.

Fricosu also submitted to Washington Mutual/WFB false information regarding

her bank balance in connection with the mortgage application for the Christy Court

residence. The SSFCU bank statements submitted to Wells Fargo Home Mortgage by

Fricosu were later compared to the true statements provided in the investigation by

SSFCU, and the documents contained falsities, as summarized below:

18

| Date | SSFCU Account #xxx xxx 4000 False Balance | SSFCU Account #xxx xxx 4000 Actual Balance | SSFCU Account #xxx xxx 4071 False Statement | SSFCU Account #xxx xxx 4071 True statement |
|---|---|---|---|---|
| 1/15/2006 | $7,024.55 | $7.50 | Two false payroll deposits from Woodcrafters of $1,211.81; Two false payroll deposits from Woodcrafters of $1,227.96 | No payroll deposits from Woodcrafters |
| 12/15/2005 | $7,023.09 | $7.50 | Two false payroll deposits from Woodcrafters of $1,211.81; Two false payroll deposits from Woodcrafters of $1,227.96 | No payroll deposits from Woodcrafters |

[Count 35] In particular, on or about September 15, 2005, in order to obtain a mortgage for the Christy Court Residence, Fricosu and Whatcott submitted a loan application and supporting documents that contained false statements, including falsities regarding where Fricosu worked, how long Fricosu had been employed, how much Fricosu earned, and her account balances in bank accounts. The false account statements were used to attempt to qualify for a mortgage loan for the purpose of knowingly executing and attempting to execute the scheme or artifice to defraud Wells Fargo Home Mortgage/WFB, which was federally insured.

## V.   ADVISORY GUIDELINE COMPUTATION AND § 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553.  In determining the particular sentence to be imposed, the Court is required to consider seven factors.  One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States

Sentencing Guidelines.  To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A.     The base guideline is § 2B1.1(a)(1), with a base offense level of **7**.

B.     The base is increased by +14 based on the loss, which is more than $400,000 but less than $1,000,000, pursuant to USSG § 2B1.1(b)(1)(k).     **+14**

C.     The government submits that there are no other specific offense characteristics, victim-related, role-in-the offense, or multiple count adjustments.  However, the defendant believes that she is entitled to a two-level decrease for "minor role" under § 3B1.2(b), and the government disputes this downward adjustment. **(-2)**

D.     The adjusted offense level by the government's calculations is therefore:     **21** [However, if the Court were to find defendant to have played a minor role, the adjusted offense level would be 19].

E.     The parties agree that Defendant should receive a 3 point decrease for acceptance of responsibility, § 3E1.1(a). The resulting offense level would therefore be 18 according to the government's calculation and 16, according to Ms. Fricosu's calculation if her offense level is reduced for "minor role."

F.     The parties understand that the defendant's criminal history computation is tentative.  The criminal history category is determined by the Court based on the defendant's prior convictions.  Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

G.     The career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.     The advisory guideline range resulting at offense level 18/ CH I = 27–33 months;

and 16/ CH I = 21–27 months.  However, in order to be as accurate as possible, with the

criminal history category undetermined at this time, the offense level(s) estimated above

could conceivably result in a range from 27 months (bottom of Category I) to 71 months

(top of Category VI) with an offense level of 18, based on the government's calculation of

the advisory USSG range. Alternatively, if this Court adjusts Ms. Fricosu's offense level

to 16, the advisory range would be from 21 months (bottom of Category I) to 57 months

(top of Category VI).  The guideline range would not exceed, in any case, the statutory

maximum applicable to the count of conviction.

I.     Pursuant to guideline § 5E1.2, assuming the estimated offense levels above, the

fine range for this offense would be $6,000 to $60,000 with an offense level of 18, or

$5,0000 to $50,000 with an offense level of 16, plus applicable interest and penalties.

J.     Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release,

that term is not more than 5 years.

K.     The parties agree that, pursuant to guideline § 5E1.1, restitution in the amount of

$1,728,071 is owed by the defendant.

The parties understand that although the Court will consider the parties' estimate,

the Court must make its own determination of the guideline range.  In doing so, the Court

is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party

from asking the Court, within the overall context of the guidelines, to depart from that

range at sentencing if that party believes that a departure is specifically authorized by the

guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines.  Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VI.   ENTIRE AGREEMENT

This document states the parties' entire agreement.  There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied.  In entering this agreement, neither the government nor the

//

//

//

//

//

defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 3/7/13

Ramona Camelia Fricosu aka Ramona Smith
Defendant

Date: 3-7-12

Philip Dubois, Esq
Attorney for Defendant

Date: 3/5/2013

Patricia Davies
Assistant U.S. Attorney

Date: 3/5/13

Anna Edgar
Assistant U.S. Attorney

23